UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    – against –

CHIN CHONG,
              Defendant.

*IN LIMINE* **MEMORANDUM
ON JURY INSTRUCTIONS
(TRACE AMOUNT
INSTRUCTION)**

13-CR-570

**Appearances:**

United States of America:        Nadia Moore
                                  U.S. Attorney's Office
                                  271 Cadman Plaza East
                                  Brooklyn, NY 11201
                                  (718) 254-6362

Chin Chong:                  Chase Scolnick
                                  Federal Defenders of New York, Inc.,
                                  One Pierrepont Plaza, 16th Floor
                                  Brooklyn, NY 11201
                                  (718) 330-1213

**JACK B. WEINSTEIN, Senior United States District Judge:**

      This memorandum is issued to explain an *in limine* decision made in preparing the charge

to the jury.

      Defendant Chin Chong is accused of being an active member in a scheme to bring a

controlled substance called methylone into the country. Methylone is the common name for 3,4-

methylenedioxy-N-methylcathinone, a chemical that was temporarily placed into Schedule I in

October 2011 and permanently placed into Schedule I in April 2013. *See* Schedules of

Controlled Substances: Temporary Placement of Three Synthetic Cathinones Into Schedule I, 76



Fed. Reg. 65,371 (Oct. 21, 2011); Controlled Substances: Placement of Methylone Into Schedule I, 78 Fed. Reg. 21,818 (Apr. 12, 2013).

A four-count indictment was returned, Dec. 16, 2013, ECF No. 52, charging that between July 1, 2013 and September 10, 2013, the defendant was guilty of: (1) conspiracy to import methylone, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1); (2) importation of methylone, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 960(b)(3); (3) conspiracy to distribute and possess with intent to distribute methylone, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C); and (4) attempted possession of methylone with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).

Customs officials at John F. Kennedy International Airport intercepted an envelope containing a suspicious crystalized substance, apparently originating from China, in September 2013. Trial Tr. 31-37, Jan. 6, 2014. A field test indicated that the substance contained methylone, a Schedule I controlled substance. Trial Tr. 35, Jan. 6, 2014. After replacing the substance with an equivalent amount of brown sugar, Homeland Security agents delivered the envelope to the listed address, a Rugs USA store in Westbury, New York. Trial Tr. 67, Jan. 6., 2014.

Ten minutes after the delivery, government agents entered the business. Trial Tr. 68-69, Jan. 6, 2014. Found on the desk of Harpreet Singh, an employee of Rugs USA, was the intercepted envelope. *Id.* Singh promptly admitted that he received the envelope on behalf of an acquaintance, knowing it to contain "Molly." Trial Tr. 70, Jan. 6, 2014.

"Molly" is a term used by users, suppliers, and law enforcement for methylone. Hr'g Tr. 5-6, Dec. 30, 2013; Trial Tr. 129, Jan. 6, 2014. It is associated with a variety of chemical substances; some are controlled and some are not. Hr'g Tr. 6, Dec. 30, 2013; Trial Tr. 223, 250-51, Dec. 7, 2013. In addition to serving as the common name for 3,4-methylenedioxy-N-

methylcathinone (the Schedule I controlled substance), "methylone" is a brand name for methylprednisolone (an unrelated corticosteroid). Hr'g Tr. 28, Jan. 2, 2014; Trial Tr. 290, Jan. 7, 2013; *accord* SWISS PHARMACEUTICAL SOCIETY, INDEX NOMINUM: INT'L DRUG DIRECTORY 1593 (18th ed., 2004).

Singh said he was to receive a few hundred dollars from the defendant, his acquaintance, in return for his services. Trial Tr. 60, 143, Jan. 6, 2014. He provided information about this individual to the government, and then collaborated with agents to execute a "controlled delivery" of the envelope. Trial Tr. 71-64, Jan. 6., 2014; Trial Tr. 151-53, Jan. 6., 2014. The hand-off never occurred. Trail Tr. 99, Jan. 6, 2014.

Later that afternoon, Homeland Security agents arrested the defendant while he was walking on a sidewalk in Flushing, Queens. Trial Tr. 103-06, Jan. 6, 2014. Singh testified that Chong is the individual with whom he conspired to import "Molly." Trial Tr. 126, Jan. 6, 2014.

A laboratory report prepared by the Drug Enforcement Agency ("DEA") indicates that the crystalline powder intercepted by Homeland Security contains some amount of "3,4-Methylenedioxymethcathinone (Methylone) Hydrochloride." While the report indicates that the tested substance had a net weight of 494.1 grams ± 0.1 grams, it lists neither the amount of methylone detected nor the tested substance's overall "purity." The forensic chemist who tested the sample confirmed that no purity test has been conducted. Trial Tr. 288, Jan. 7, 2014. The Assistant United States Attorney represents that, because of budgetary constraints, "approximately two or three months ago [the DEA laboratory] stopped conducting purity analysis in addition to the analysis to determine the chemical substance presence in all but a few exceptions." Hr'g Tr. 9, Dec. 30, 2013. Testing for drug purity was routine in prior cases.

The absence of evidence regarding the purity of the seized substance raises a significant legal problem: jurors could find that the government proved that the defendant knowingly imported some detectable amount of methylone, while harboring a reasonable doubt as to whether the defendant knowingly imported more than a *de minimis* quantity of the controlled substance. The jury can be expected to have general knowledge of mislabeling of some Chinese products. *See* David Barboza, *Ex-Chief of China Food and Drug Unit Sentenced to Death for Graft*, N.Y. TIMES, May 30, 2007, at A1. Jurors might well be concerned that the conspirators sought to obtain pure methylone, knowing methylone to be a controlled substance, but the supplier furnished a batch consisting almost entirely of some non-controlled substance. Manufacturers and suppliers of synthetic drugs often begin marketing new versions of substances known as "Molly" once earlier iterations are added to the Drug Enforcement Agency's list of controlled substances. Trial Tr. 245-46, 261, Jan. 7, 2013. Substances received from synthetic drug laboratories in China may not be consistent with the specific chemicals ordered. Trial Tr. 248, Jan. 7, 2013. Jurors' minds are not a clean slate; they help bring knowledge of real world commerce into the courtroom.

The government urges that the knowing importation of a single molecule of a controlled substance constitutes a felony offense, emphasizing that the plain language of section 960(a) contains no minimum-quantity requirement. *See* § 960(a) ("Any person who[] . . . knowingly or intentionally imports or exports a controlled substance . . . shall be punished as provided in subsection (b) of this section."); *see also* § 951(a)(1) ("The term 'import' means, with respect to any article, any bringing in or introduction of such article into any area . . . ."). It points out that the mandatory-minimum penalties set forth in sections 960(b)(1) and 960(b)(2) apply to importation offenses involving "a mixture or substance containing *a detectable amount*" of

certain controlled substances. *See* § 960(b) (emphasis added). It argues that this language signals that an individual can commit a section 960(a) offense by importing nothing more than a "detectable amount" of a controlled substance. *Cf. United States v. Shurtz*, 510 F.3d 1242, 1243 (10th Cir. 2007) (conviction for conspiracy to distribute "Schedule II" substance does not require proof "that the quantity involved would have a stimulant effect on the central nervous system").

Chong is charged with a section 960(b)(3) importation offense. This penalty provision contains no "detectable amount" language.

The government's proposed interpretation of the statute can generate absurd results, particularly in light of the severe criminal penalties attendant upon drug crimes. Credible studies indicate that as much as 90% of the paper currency in the United States is contaminated with a "detectable amount" of cocaine. *See, e.g., United States v. U.S. Currency, $30,060.00*, 39 F.3d 1039, 1042 (9th Cir. 1994) (citing evidence that 75% of paper currency tested in Los Angeles and Las Vegas tested positive for cocaine); Andy G. Rickman, Note, *Currency Contamination and Drug-Sniffing Canines: Should Any Evidentiary Value be Attached to a Dog's Alert on Cash?* 85 KY. L.J. 199, 200-03 (1997) (listing studies indicating "the vast contamination of the United States' cash supply"); Amanda J. Jenkins, Office of the Cuyahoga Cnty. Coroner, *Drug Contamination of US Paper Currency*, 121 FORENSIC SCI. INT'L 189 (2001) (finding 92% of bills collected from five U.S. cities tested positive for cocaine, and other bills tested positive for heroin, morphine, methamphetamine, and PCP); A. Negrusz, J.L. Perry, and C.M. Moore, *Detection of Cocaine on Various Denominations of United States Currency*, 43(3) J. FORENSIC SCI. 626 (1998) ("Cocaine was present on 92.8% of all bills collected from the general circulation."). These studies are known not just to the courts, law enforcement, and forensic chemists, but to members of the general public. *See, e.g.,* Helen Kennedy, *A Low Blow! There's*

*Coke on Nearly All U.S. Currency*, N.Y. DAILY NEWS, Aug. 18, 2009, at 6 (reporting study presented at biannual meeting of the American Chemical Society that 85% of paper currency is contaminated with cocaine); Malcolm W. Browne, *Drug Money (in Literal Sense) Is a New Legal Twist*, N.Y. TIMES, Sept. 23, 1997, at F5 (reporting laboratory study indicating 75% of $1 bills circulating in Chicago suburbs, Miami, and Houston are tainted with cocaine); Margaret Landers, *Look Who Has Cocaine*, MIAMI HERALD, Feb. 19, 1985, at C1 (reporting 10 of 11 bills tested by newspaper contained cocaine, including currency volunteered by Jeb Bush, Janet Reno, and Archibishop Edward McCarthy).

Would a knowledgeable judge with a contaminated $10 bill carried in his wallet on return to the United States from a judicial conference in London be committing a serious drug crime? The government's wooden interpretation of section 960(a) would dictate that any individual who enters the United States with a modest amount of United States currency has committed a felony drug offense, assuming the traveler is familiar with the contents of her wallet and these well-known facts on contamination referred to above. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) (interpretations of a statute that produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available).

A tenable interpretation of section 960(a) is provided by the Supreme Court's discussion of the purpose and approach undergirding the federal drug laws in *Chapman v. United States*. *See* 500 U.S. 453, 459-68 (1991) (suggesting a "market-oriented" approach to sentencing determinations for drug offenses); *see also United States v. Acosta*, 963 F.2d 551, 556 (2d. Cir. 1992) ("The government also seeks to avoid *Chapman*'s discussion of Congress' market-oriented approach by arguing that this is an *importation* case (21 U.S.C. §§ 952 & 960), whereas

*Chapman* was a *distribution* case (21 U.S.C. § 841). This is unpersuasive.) (emphasis in original).

In *Chapman*, the Court held that the weight of a "carrier medium" (*i.e.*, blotter paper) for a controlled substance, such as LSD, may be included in an overall quantity calculation when considering an appropriate sentence. 500 U.S. at 461. It explained that "Congress adopted a 'market-oriented' approach to punishing drug trafficking[:] the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." *Id.* at 461. The consumer of the LSD analyzed in *Chapman*—10 sheets containing 1,000 individual doses, *id.* at 455—would normally imbibe the drug-soaked blotter squares. In that circumstance, counting the entire doses' weight made economic sense. Because "blotter paper [is] customarily used to distribute LSD" and "Congress did not want to punish retail traffickers less severely [than wholesale distributors]," the Court held that "the statute requires the weight of the carrier medium to be included when determining the appropriate sentence . . . and that this construction is [constitutional]." *Id.*

The *Chapman* Court's market-oriented reasoning supports the conclusion that an individual must import more than a *de minimis* quantity of a controlled substance in order to violate section 960(a). From a market-oriented perspective, importation of a mixture consisting of sugar and a trace amount of methylone is indistinguishable from importation of pure sugar. In either case, the importer has not brought into the country a mixture or substance that can be sold or used as methylone, "cut or uncut, pure or impure, ready for wholesale or ready for distribution at the street level." *Chapman*, 500 U.S. at 461.; *cf. United States v. Rolande-Gabriel*, 938 F.2d 1231, 1238 (11th Cir. 1991) (relying on *Chapman*'s "market-oriented" reasoning to conclude

that weight of "unusable mixture, *i.e.*, unusable or unmarketable to the consumer" should not be considered for sentencing purposes).

To commit a felony under section 960(a), the importation must involve a quantity of a controlled substance—in pure, diluted, or otherwise extractable form—sufficient to have some use- or exchange-value, however small, to a user, buyer, or seller of controlled substances. *De minimis* is interpreted to mean a quantity that is unmarketable as an illegal drug because it is insufficient to provide any of the physiological or psychoactive effects a consumer of such substances might seek. If a verdict of "guilty" is returned on Count Two of the indictment, indicating that Chong knowingly imported a controlled substance, a supplemental question will be posed to the jury. It is:

> Did the government prove beyond a reasonable doubt that the defendant (or the person he aided or abetted) imported more than a trace amount of methylone? A 'trace amount' is a quantity that has no value to someone seeking to use, sell, or distribute methylone.

During the course of the trial, evidence on the "trace amount" issue may be introduced. The parties will be given the opportunity to make further closing arguments to jury on this question.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: January 8, 2014
     Brooklyn, New York