


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA, | AMENDED *IN LIMINE* MEMORANDUM ON JURY INSTRUCTIONS (*MENS REA* ISSUE) |
|---|---|
| – against – | |
| CHIN CHONG, | 13-CR-570 |
| Defendant. | |

**Appearances:**

United States of America:	Nadia Moore
	U.S. Attorney's Office
	271 Cadman Plaza East
	Brooklyn, NY 11201
	(718) 254-6362

Chin Chong:	Chase Scolnick
	Federal Defenders of New York, Inc.,
	One Pierrepont Plaza, 16th Floor
	Brooklyn, NY 11201
	(718) 330-1213

**JACK B. WEINSTEIN, Senior United States District Judge:**

This memorandum is issued to explain an *in limine* decision made in preparing the charge to the jury.

Defendant Chin Chong is accused of being an active member in a scheme to bring a controlled substance called methylone into the country. Methylone is the common name for 3,4-methylenedioxy-N-methylcathinone, a chemical that was temporarily placed into Schedule I in October 2011 and permanently placed into Schedule I in April 2013. *See* Schedules of Controlled Substances: Temporary Placement of Three Synthetic Cathinones Into Schedule I, 76 Fed. Reg. 65,371 (Oct. 21, 2011); Controlled Substances: Placement of Methylone Into Schedule I, 78 Fed. Reg. 21,818 (Apr. 12, 2013).

1



A four-count indictment was returned, Dec. 16, 2013, ECF No. 52, charging that between July 1, 2013 and September 10, 2013, the defendant was guilty of: (1) conspiracy to import methylone, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1); (2) importation of methylone, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 960(b)(3); (3) conspiracy to distribute and possess with intent to distribute methylone, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C); and (4) attempted possession of methylone with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).

"Molly" is a term used by users, suppliers, and law enforcement for methylone. Hr'g Tr. 5-6, Dec. 30, 2013; Trial Tr. 129, Jan. 6, 2014. It is associated with a variety of chemical substances; some are controlled and some are not. Hr'g Tr. 6, Dec. 30, 2013; Trial Tr. 223, 250-51, Dec. 7, 2013. In addition to serving as the common name for 3,4-methylenedioxy-N-methylcathinone (the Schedule I controlled substance), "methylone" is a brand name for methylprednisolone (an unrelated corticosteroid). Hr'g Tr. 28, Jan. 2, 2014; Trial Tr. 290, Jan. 7, 2013; *accord* SWISS PHARMACEUTICAL SOCIETY, INDEX NOMINUM: INT'L DRUG DIRECTORY 1593 (18th ed., 2004).

The defendant's knowledge concerning "Molly," methylone, and related controlled substances is a central trial issue. Additional background information for the case is contained in a separate memorandum issued today. *See In Limine Memorandum on Jury Instructions (Trace Amount Instruction)*, Jan. 8, 2013.

Section 841(a) makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]" Section 960 provides that "[a]ny person who . . .

knowingly or intentionally imports or exports a controlled substance" has committed a felony offense.

To sustain any of the four charges, the government must prove that the defendant knew the substance he allegedly imported and sought to possess with intent to distribute was a controlled substance. *See* Hr'g Tr. 11-12, Dec. 30, 2013; Trial Tr. 179-85, Jan. 6, 2014; *accord* PATTERN CRIMINAL FEDERAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT 641 (2012 ed.) ("In order for you to find [a; the] defendant guilty of [21 U.S.C. § 841(a)(1)], the government must prove . . . [t]he defendant knew the substance [was; contained] some kind of controlled substance.").

For each of the four charges, the jury has received a variation of the following instruction:

> The government must prove that the defendant knew the substance he allegedly [conspired to import / imported / conspired to distribute or possess / attempted to possess] was a controlled substance. 3,4-methylenedioxy-N-methylcathinone is a controlled substance. It became a controlled substance on a temporary basis on October 21, 2011 and on a permanent basis on April 12, 2013. A substance is on this list and illegal whether denominated "temporary" or "permanent."
> The government need not prove that the defendant knew the exact nature of the controlled substance involved in the alleged offense. Although the government must prove that the defendant knew the substance he allegedly [conspired to import / imported / conspired to distribute or possess / attempted to possess] was a controlled substance, the government does not have to prove that the defendant knew that the controlled substance was 3,4-methylenedioxy-N-methylcathinone.
> The government must prove that the defendant knew the substance that he [conspired to import / imported / conspired to distribute or possess / attempted to possess] was classified as an illegal, "controlled" substance. On this knowledge issue, you may consider all of the evidence, including the date on which 3,4-methylenedioxy-N-methylcathinone became a controlled substance, the total number of chemicals known as "Molly," any actions by the defendant suggesting that he knew he was dealing with an illegal controlled substance, and an admission by him, if any, on that point.

This instruction is consistent with the general principal that "[c]ourts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element." *Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009). Here, the word "knowingly" in sections 841(a) and 960(a)(1) modifies not only the respective verbs ("distribute," "possess," and "import[]"), but all elements of the offenses, including "controlled substance."

To avoid drug prosecutions and encourage consumer use, manufacturers and suppliers of synthetic drugs often begin marketing new versions of substances known as "Molly" once earlier iterations are added to the list of controlled substances. Trial Tr. 245-46, 261, Jan. 7, 2013. It is not uncommon for different batches of the same brand of "Molly" to contain different drugs, Trial Tr. 256, Jan. 7, 2013, and substances received from synthetic drug laboratories in China may not be consistent with the specific chemicals ordered, Trial Tr. 248, Jan. 7, 2013.

These substances provide problems in enforcement and in some trials because (1) chemical formulas and legal prohibitions are constantly changing, generating significant uncertainty about the legality of particular substances, Trial Tr. 226-29, Jan. 7, 2013; Trial Tr. 245-46, Jan. 7, 2013 (2) states are sometimes ahead of the federal government, prohibiting particular chemicals before they become "controlled substances" under federal law, *see* 76 Fed. Reg. 65,373 (noting "37 states [had] emergency scheduled or enacted legislation placing regulatory controls on some or many of the synthetic cathinones" before DEA temporarily placed methylone on Schedule I); (3) manufacturers from abroad may mislabel, modify, and provide product not up to specifications, Trial Tr. 248, Jan. 7, 2013; (4) users and retailers may misunderstand whether the particular form

of the drug they are imbibing is outlawed, Trial Tr. 258-59, Jan. 7, 2013 (discussing availability of "Molly" through Amazon.com and DEA outreach to large retailers); and (5) technical issues complicate the automatic outlawing of new drugs as "controlled substance analogues," a potentially vague category encompassing "substantially similar" chemicals "to the extent [they are] intended for human consumption," *see* 21 U.S.C. §§ 802(32)(A), 813; *see also United States v. Forbes*, 806 F.Supp. 232 (D.Colo. 1992) ("Although the 'substantially similar' language may be generally susceptible to adequate definition, it runs afoul of the vagueness doctrine when it is applied to [the chemical at issue] under the circumstances of this case.").

The *mens rea* requirement reflected in the instruction should be construed as importing the mistake-of-law defense into the statutes for the limited purpose of dealing with criminal activities in connection with exotic designer drugs. This is not contrary to the general view that "ignorance of the law is no excuse." *See* OLIVER WENDELL HOLMES, THE COMMON LAW 41 (M. Howe ed. 1963) (1881). This legal generality is modified in limited settings as a matter of statutory construction where it is necessary to afford prospective defendants a measure of fair notice consistent with the principles of due process. *See Flores-Figueroa*, 556 U.S. at 652 (discussing *Liparota v. United States*, 471 U.S. 419 (1985)); *see also Cheek v. United States*, 498 U.S. 192, 200 (1991) ("Congress has . . . softened the impact of the common-law presumption [that every person knows the law] by making specific intent to violate the law an element of certain federal criminal tax offenses"). The doctrine of qualified immunity and the proliferating exceptions to the Fourth Amendment's exclusionary rule are but two examples of areas of law in which actors' reasonable mistakes are countenanced. *See, e.g., Anderson v.*

5

*Creighton*, 483 U.S. 635 (1987) (holding officer who participates in search that violates the Fourth Amendment not liable for money damages if a reasonable officer could have believed that the search comported with the Fourth Amendment); *United States v. Leon*, 468 U.S. 897 (1984) (holding exclusionary rule does not bar use of unconstitutionally obtained evidence where officers reasonably relied on search warrant issued by detached and neutral magistrate).

In the vast majority of drug-related prosecutions, it will be simple for the government to prove that the accused knew he or she was trafficking in some form of a controlled substance. Given the widespread publicity surrounding the large number of arrests and convictions relating to marijuana, cocaine, heroin, and methamphetamine importation and distribution over the past several decades, it is common knowledge that such substances are "controlled." *See generally* U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CRIME IN THE U.S. (1995-2012), at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s. (providing national arrest statistics).

In rare circumstances like those presented by this designer drug case, "[t]he proliferation of statutes and regulations [can] sometimes ma[ke] it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the . . . laws." *Cheek*, 498 U.S. at 199-200.

As in other drug cases, direct and circumstantial evidence, including evidence of the defendant's furtive conduct, can suffice to demonstrate that the defendant knew that the substance at issue was "controlled." Given the harsh penalties that attach for the instant crimes—Chong faces up to eighty years in prison if convicted on all counts—the jury here must be persuaded of the defendant's knowledge that the substance he is

charged with trafficking was on the proscribed list. *See* Jack B. Weinstein & Fred A. Bernstein, *The Denigration of Mens Rea in Drug Sentencing* 7 FED. SENT'G REP. 121, 122 (1994) ("Culpability doctrines do more than separate the innocent from the guilty. They mediate between the individual and society, ensuring that a complex web of legal commands and protections operates effectively and in a properly nuanced fashion.")

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: January 13, 2014
       Brooklyn, New York